### In re ORANGE COUNTY NURSERY, INC., Debtor(s).

No. 1:09–bk–22100–GM.

United States Bankruptcy Court, C.D. California, San Fernando Valley Division.

Nov. 15, 2012.

Arthur Gutierrez Longoria, Covina, CA, David S. Kupetz, Sulmeyer Kupetz, Los Angeles, CA, Elissa Miller, Los Angeles, CA, Steven Werth, Los Angeles, CA, Tamar Kouyoumjian, Los Angeles, CA, for Debtor.

**SUPPLEMENTAL MEMORANDUM OF OPINION ON MOTION OF THE MINORITY VOTING TRUST TO RECONSIDER TREATMENT AND VALUE OF ITS CLAIM RE: SUBORDINATION AND PRIORITY [DOCKET 652]**

GERALDINE MUND, Bankruptcy Judge.

This motion arises from a dissolution action of the debtor corporation Orange County Nursery, Inc. (hereafter, "Debtor").[1] Pursuant to Cal. Corp.Code § 2000, on November 21, 2008, after extensive litigation, the Superior Court valued the Minority Voting Trust's (hereafter "Minority") 40.25% equity interest in the Debtor at $4,906,475 as of August 4, 2006, plus interest to the date of judgment for a total of $5,249,928 (the "Superior Court Order"). The Superior Court Order also provided that the Debtor could either pay that amount to the Minority or liquidate. This ruling was appealed by a voting trust holding 50.25 percent of the Debtor (the "Majority").[2]

The Majority failed to obtain a stay of the Superior Court Order from the Court of Appeal and on January 22, 2009, just before the deadline to pay the $5,249,928 value (hereafter, the "Judgment"), the Debtor filed this bankruptcy case. The Minority filed claim # 73 on May 14, 2009, asserting a liquidated total of $6,008,424.75 ($5,249,928 per the Superior Court Order and $758,496.75 in pre-petition legal fees), and it also noted that it was claiming post-petition fees under Cal. Corp.Code § 2000(c) in an amount that was not yet determined.

In its first amended plan, the Debtor classified the Minority as an equity holder, who would receive nothing under the plan. I agreed with this classification, which the Minority appealed.[3] Later, the Minority also appealed both the order confirming the Debtor's fourth amended plan[4] and the order allowing the Minority's claim for pre-petition attorneys' fees and costs[5] but

---

1. Veyna v. Orange County Nursery, Inc., Orange County Superior Court Case 06 CC 08763.

2. Veyna et al. v. Orange County Nursery Inc. et al., G041305, filed 12/8/08. This appeal is still pending, although it has been stayed by the filing of the bankruptcy. The remaining 9.5% of Debtor's stock is held by other parties.

3. *The Minority Voting Trust, et al. v. Orange County Nursery,* 439 B.R. 144 (C.D.Cal.2010).

4. *The Minority Voting Trust, et al. v. Orange County Nursery,* 439 B.R. 144 (C.D.Cal.2010).

5. The Minority has asserted claims for pre-petition and post-petition attorneys' fees and costs, which are classified separately from the Minority's claim or interest arising out of the Superior Court Order. These attorneys' fees and costs are not the subject of this ruling.

limiting them to the $150,000 value of the bond posted by the Debtor.[6]

The District Court combined all three of these appeals into one ruling, which was favorable to the Minority (the "District Court Order").[7] The District Court ruled that the Minority had a claim for the value of its shares as if the Debtor had been dissolved and that the Minority's claim for attorneys' fees and costs should not be limited to the $150,000 bond posted by the Debtor. The District Court remanded, leaving the questions of the appropriate measure of dissolution value and the reasonableness of attorneys' fees to this Court. It also ruled that to the extent any subsequent orders of this Court, including the order confirming the Debtor's fourth amended plan of reorganization, treated the Minority's claim as equity, they would need to be vacated or modified.

The Debtor then appealed to the Ninth Circuit.

Soon after the District Court Order was issued, the Minority brought an emergency motion for an order compelling the Debtor to modify its confirmed fourth amended plan of reorganization or, alternatively, partially vacating this Court's order confirming the Debtor's plan and confirming a plan proposed by the Minority.[8] This Court denied the Minority's motion on grounds that it lacked jurisdiction to implement the District Court Order while it was on appeal to the Ninth Circuit and that implementing the District Court Order while it was still on appeal would unnecessarily run up administrative expenses and waste court resources.[9] The Minority appealed this ruling, but the District Court affirmed.[10]

On April 23, 2012, the Ninth Circuit dismissed the Debtor's appeal of the original District Court Order as interlocutory, noting that "the bankruptcy court has not yet had the opportunity to exercise its fact-finding power and value the claims at issue; by dismissing the appeal, we avoid addressing the legal questions on an underdeveloped record." [11]

The Minority then brought another motion to enforce in the District Court Order: this motion sought an order (i) requiring the Debtor to modify its confirmed plan or, alternatively, vacating the confirmation order in part and confirming the Minority's proposed plan and (ii) vacating the orders determining the Minority's claim and attorneys' fee award.[12] In the ensuing cascade of briefs and hearings, the Debtor continued to argue that the Minority holds an equity interest rather than a claim, but with a new twist. The Debtor asserted that the effect of the Superior Court Order and the District Court Order was to create a forced purchase governed by 11 U.S.C. § 510(b), which subordinated the Minority's claim to the same priority as that of common stock and that the proper valuation date was that of the plan confirmation

---

6. *The Minority Voting Trust, et al. v. Orange County Nursery,* 439 B.R. 144 (C.D.Cal.2010).

7. Order re: Bankruptcy Appeal, dated Oct. 12, 2010, *The Minority Voting Trust v. Orange County Nursery,* 439 B.R. 144 (C.D.Cal.2010).

8. Motion filed 11/22/10 (doc. 537).

9. Order entered 12/23/10 (doc. 561).

10. Order re: Bankruptcy Appeal, dated 4/13/12 in In re Orange County Nursery, Inc., C.D. Cal. case no. CV–11–687–DMG. (Doc. 588 in this case).

11. Memorandum, entered 4/23/12, in *Orange County Nursery, Inc. v. The Minority Voting Trust, et al.,* 472 Fed.Appx. 727 (9th Cir.2012) (doc. 45–1).

12. Motion filed 5/8/12 (doc. 592).

hearing.[13] This issue was not dealt with in the District Court Order and after hearing argument on this issue, this Court entered an order that, among other things, subordinated the Minority's claim pursuant to 11 U.S.C. § 510(b).[14]

The Minority brought a motion asking for reconsideration of the § 510(b) subordination ruling (the "Reconsideration Motion") on the grounds that the priority of the Minority's claim was not within the scope of briefing previously mandated by the Court. The Debtor filed an opposition, the Minority filed a reply and the Reconsideration Motion was heard on October 9, 2012 and taken under submission. After considering the arguments of the parties, the Court granted the Reconsideration Motion and set November 6, 2012 at 10:00 a.m. to hear argument on whether the Minority's claim should be subordinated pursuant to 11 U.S.C. § 510(b). This hearing was subsequently continued to November 20, 2012 at 10:00 a.m. The parties were allowed to file further briefs up to and including October 24, 2012. Only the Debtor did so, filing a Statement regarding the motion for reconsideration on October 24, 2012 (the "Supplemental Statement").

The Court finds that the issues have been sufficiently briefed so that it can make its ruling without the need for further argument. That ruling is set forth herein.

**13.** Brief of Orange County Nursery, Inc. re Procedure for Valuing Minority Claim (doc. 613).

**14.** Memorandum and Order entered on 9/4/12 (doc. ## 647, 648).

**15.** Bankruptcy Code § 108(b), which gives debtors an additional 60 days after the petition date to take actions under state court

### Classification of Minority

Before turning to § 510(b), it will be important to consider the nature and classification of the Minority's claim or interest in the Debtor. Prior to filing the dissolution action, the Minority was simply a stockholder—equity. Upon entry of the 11/21/08 Superior Court Order and continuing until the 1/22/09 deadline for the Debtor to pay the Judgment, the Minority had the right to receive *either* the judgment total of $5,249,928 *or* its pro rata share of the proceeds from the liquidation of the Debtor, at the election of the Debtor. Thus, the Minority potentially could be treated either as a creditor (paid the fixed amount of the Judgment) or as equity (paid its share of the Debtor's value at the conclusion of the dissolution process) and it had no control over which treatment it received. It had mixed expectations of debt and equity.

 Had the deadline for payment expired without the Debtor paying the Judgment, the Minority would have returned to an undiluted equity status, because it would simply be entitled to its share of the proceeds of the Debtor's liquidation. But the Debtor filed for chapter 11 relief hours before the time to pay the Judgment expired. Because of this at the time of the petition, the Minority still had the right to receive and the obligation to accept payment of the amount of the Judgment rather than obtain a prorate share of the equity through an eventual dissolution. The existence of claim and interests is determined as of the petition date.[15] *See*

orders, potentially complicates this conclusion. It could be argued that once the deadline for the Debtor to pay the Judgment had passed, whether it was a few hours after the petition was filed or 60 days after the petition date pursuant to Bankruptcy Code § 108(b), the Minority reverted to its equity status. But it makes no sense to view this case through the § 108(b) filter: once the petition was filed, the Debtor simply could not have paid

11 U.S.C. § 101(5) & (10); *see, e.g., Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 528 (5th Cir.2004) ("Rights of holders of claims and interests are fixed on the Petition Date"); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499 (Bankr.D.Ariz.2000) ("put right" not a claim because, among other things, not yet exercisable on petition date); *Jeffries v. Buckley (In re Buckley)*, 404 B.R. 877 (Bankr.S.D.Ohio 2009). The Minority walked into this bankruptcy holding a mixed bag of rights and expectations, both debt and equity.

This mixed set of contingencies makes the Minority's investment in the Debtor very difficult to classify. The Minority's position is unique and it must be treated as unique. In some ways it is like trying to fit a round peg into the square holes of debt (creditor) or interest (equity). It doesn't quite fit in either category, but the Bankruptcy Code does not provide for a hybrid alternative to debt and equity and I was unable to find any cases dealing with this type of mixed contingencies.

The District Court Order determined that the Minority held debt, because the Superior Court Order gave the Minority an "enforceable right to payment for its shares-either $5,249,928 for their appraised value or ... their actual value upon [the Debtor's] forced dissolution." District Court Order at 10. The District Court sees the Minority's receipt of its pro rata share from the Debtor's liquidation as a right to payment and thus a claim, but it can also be seen as giving the Minority equity—realization of their share of Debtor's value after the creditors are all paid their fixed claims. The District Court's view has the virtue of simplicity: under either contingency the Minority is a creditor (subordinate to other creditors) and can simply be treated as such. While the District Court Order is not final and binding, it should be recognized and considered by the Court and may well become the law of this case if upheld on appeal.

And the treatment of the Minority as a creditor, taken together with its subordination to other unsecured creditors (through the operation of California law), most closely approximates the Minority's hybrid status by prioritizing it below the general unsecured creditor group, but those who only hold an interest.

The Minority should be treated as a creditor because once the Superior Court Order was issued, the Minority effectively stopped sharing in the debtor's potential upside. If the value of the Debtor and its equity increased sufficiently, the Majority could elect to pay the Minority the Judgment amount and keep the enhanced equity value for itself. If the Debtor did not increase significantly in value or decreased in value, then the Majority could elect to liquidate the corporation, forcing the Minority to share in the pain of decreased value. In the bargain inherent in capital structure, the Minority is far more like Creditors who are paid ahead of equity in exchange for no expectation of sharing in any upside, than it is like equity. Its right

the Judgment. It lacked adequate cash to do so, and would have had to borrow money (effectively substituting an administrative claim or higher priority indebtedness for subordinated debt, which no bankruptcy court would authorize) or obtain additional equity investment (exceedingly unlikely). Even if the Debtor had cash on hand to cover the Judgment, no bankruptcy court would have allowed a debtor to use property of the estate to pay subordinated debt or equity, especially in the first hours or sixty days of the case. The value of a prepetition claim amount may be affected by events that occur only after the petition date, but its status as a claim must be determined as of the petition date. *See, e.g., Kronemyer v. Am. Contrs. Indem. Co. (In re Kronemyer)*, 405 B.R. 915, 920 (9th Cir. BAP 2009) (rights are fixed as of the petition date, but a claim can be liquidated thereafter).

to payment was fixed in the sense that it would never be paid more than the Judgment.

Even if it were equity, the Minority's status is substantially different from other common stock.[16] As the District Court points out, no other shareholder was "entitled to payment for its shares' appraised value as of August 4, 2006 or to liquidate the corporation" or "had the standing to dissolve" the Debtor. District Court Order at 10. As a result of these differences, the Minority should be classified separately from equity under § 1122, which mandates that claims and interests that are not substantially similar should not be placed in the same class. *See Wells Fargo Bank v. Loop 76, LLC (In re Loop, LLC)*, 465 B.R. 525 (9th Cir. BAP 2012) (existence of third party source of payment to the unsecured creditor can render claim not substantially similar to those of other unsecured creditors).[17]

The Minority's characterization as debt has a huge impact on the ability to confirm the plan: the Minority would be entitled to separate classification and priority below general unsecured creditors and above common stock. The irony of this is that had the Majority not rushed to file bankruptcy before the payment deadline, the rights of the Minority on the petition date would solely be to receive the equity in the dissolved corporation. Its standing as a

creditor would have disappeared and it is possible that it would have little to support an argument that it is anything more than equity, which is entitled to share pro rata with other equity in the dissolution value at the time of confirmation—precisely what the Majority is now seeking.

Only § 510(b) would change that outcome, for it subordinates claims to "the same priority as common stock." Accordingly, we turn to the Minority's arguments for reconsideration of this Court's subordination of the Minority's claim under § 510(b). For ease of reference, the analysis behind the court's initial ruling on § 510(b) subordination of the Minority's claims is annexed hereto as Exhibit A.

**Minority's Arguments against Subordination**

The Minority first argues that § 510(b) is not applicable, both because the Minority's claim is not from "the purchase or sale" of Debtor's stock, but for damages from Debtor's "breach of the [state court] Judgment—that is, its failure to dissolve"[18] and is a "statutorily-driven, affirmative election made by a California corporation to repurchase its own stock from a shareholder." Motion at 5. These highly technical (and somewhat inconsistent) arguments are ultimately unpersuasive in light of the § 510(b) precedent cited in the original ruling (as the Debtor's Supplemental Statement discusses in some de-

---

**16.** The Minority's rights resemble mandatory redemption rights of preferred stock, which have been held to be equity (although in some cases that was because they were not yet exercisable on the petition date). *See, e.g., Jobs.com*, 393 F.3d at 524–27 (redemption rights not ripe); *In re Revco D.S., Inc.*, 118 B.R. 468, 474 (Bankr.N.D.Ohio 1990). However, this analogy is not ultimately useful because preferred stock usually (i) carries other rights not analogous to the Minority's rights and (ii) is contractually superior to common stock so the effect of classifying it as equity has different implications.

**17.** Exactly what priority a separate equity class containing the Minority's shares would have relative to the other common stock is not relevant at this time and the Court will not address it.

**18.** The Superior Court Judgment does not, in fact, characterize the dissolution alternative as a remedy for failure to pay the Judgment amount, merely an alternative.

tail). The Fifth Circuit in *SeaQuest Diving, LP v. S & J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411 (5th Cir.2009), focused on the underlying nature of the claim and held that a judgment does not change a claim's original basis in equity: "we reject S & J's argument that 'the equitable nature of a claim is lost once it is converted to a . . . judgment.'" *SeaQuest*, 579 F.3d at 424. The argument that there is "no purchase or sale" of Debtor's security is simply irrelevant in light of the 9th Circuit holding that an actual purchase or sale is not required for § 510(b) to apply.[19] *Am. Broad. Sys. v. Nugent (In re Betacom)*, 240 F.3d 823, 830 (9th Cir.2001). And *Betacom* uses the phrase "shareholders with a claim for damages" to describe the very parties who should be covered by § 510(b). *Id.* at 831.

In making these arguments, the Minority states that the District Court "effectively rejected" and "implicitly ruled" against § 510(b) subordination. This argument is not entirely clear and appears to rely on a series of questionable assumptions and conclusions, which I will not take the time to parse through. In fact, the District Court Order makes quite clear that it is not addressing the issue of subordination. District Court Order at 7.

The Minority goes on to argue that its claim is not for rescission (which the 5th Circuit in *SeaQuest* held was covered by § 510(b)) but is "redemption-based" (which *SeaQuest* said "might" not be covered by § 510(b)). While true, this statement means only that § 510(b) subordination in this instance is not automatic but requires further analysis—such as the analysis in the initial ruling and in this ruling.

■ The Minority argues that if the Debtor lacked the requisite capital reserves to pay the Judgment, then, by operation of Cal. Corp.Code § 1306, the Minority became a creditor of the Debtor, subordinate to the other creditors. Assuming the Minority is a creditor (through Cal. Corp.Code § 1306 or otherwise), the conclusion that the Minority draws from creditor status—that it is superior to equity and § 510(b) cannot disturb that superiority—is incorrect. What § 510(b) does, quite expressly and intentionally, is to disturb the superior status of certain claims in the circumstances specified in § 510(b).

■ The Minority next argues that "the Judgment was essentially a court-approved stipulation" in which "the Majority provided the Minority with an express covenant of subordination as to the equity interests of the Majority" (Motion at 8), which must be enforced under Bankruptcy Code § 510(a). But, by its clear, express terms, § 510(a) only covers agreements. The Motion does not define what the Minority means by "Judgment," but from the context it appears to refer to the Superior Court Order. And, although Debtor's attorney apparently consented as to form, the Superior Court Order is not a stipulation (or any other form of agreement), nor does it have express subordination provisions.[20] If the Minority is referring to another judgment that actually is a stipula-

---

**19.** The Minority quotes the Ninth Circuit in an LBO fraudulent transfer case, *Lippi v. City Bank*, 955 F.2d 599, 609 (9th Cir.1992), for the proposition that a corporation's acquisition of its own shares is not really a sale. Not only is the definition of sale for fraudulent transfer purposes not relevant to the question at hand, *Lippi* actually undermines the Minority position. The fact that the corporation acquired nothing of value in acquiring its own shares led the Ninth Circuit to conclude that this non-sale cash-out by some equity was potentially voidable under § 544.

**20.** *See* Order Confirming Award of Appraisers, which is annexed to Doc. 622–2 as Exhibit B.

tion, it should provide it to the Court. If it is indeed referring to the Superior Court Order, the argument that it is "essentially" an agreement with subordination provisions is nonsense.

Finally, the Minority argues that the policy rationales underlying § 510(b)—both protection of the expectations of creditors and the dissimilar risk/return ratios of shareholders and creditors—do not apply in this situation. First, the Minority does not seek to be paid *pari passu* with other creditors, only to be paid ahead of the Majority's equity, and thus the expectations of other creditors are irrelevant. Second, because the value of the Minority's interest will be calculated as of the petition date pursuant to this Court's order, it is a fixed amount not subject to fluctuation and thus the Minority no longer shares in the risks and rewards of equity. These rationales are truly the important question at issue and one wishes that the Minority had devoted more attention to these issues and less to the preceding make-weight arguments.

■ The Minority is correct that its subordination to other creditors negates at least some portion of one policy rationale for § 510(b): protecting the expectations of creditors who relied on equity when extending credit to the Debtor and fairness to them in enforcing the absolute priority rule. With the Minority subordinated to other creditors, no creditors will be harmed by the Minority's elevation to debt.

Protection of other equity could also be a policy rationale for Section 510(b), which ordinarily operates in a way that protects both creditors and other equity holders from some equity seeking to recover its investment as debt. However, none of the § 510(b) precedent relied upon by this Court offers protection of equity as a rationale and this case law already takes an expansive view of § 510(b). I am reluctant to further expand § 510(b)'s reach to protect equity, in the absence of some supporting authority.

The risk allocation policy rationale for § 510(b), i.e., whether the Minority had the risk and reward expectations of a creditor or equity, takes a different, more abstract perspective on the question of fairness. Rather than harm to others, this rationale focuses on whether, given the Minority's risk/reward allocation, repaying it as debt would confer an unfair advantage on it. "The creditor can only recoup her investment; the investor expects to participate in firm profits." *Betacom*, 240 F.3d at 830.

The Minority's expectations were not entirely fixed on the petition date, as the Minority argues. But, as discussed in detail in the preceding section, at that instant in time the Minority had mixed debt and equity expectations that it did not control. It could be paid as debt at the debtor's election and would in all likelihood not participate in the Debtor's profits if there were profits to participate in. It had effectively lost "the primary benefit of [stock] ownership: the potential for upside." *Official Comm. of Unsecured Creditors v. Mobile Tool Int'l, Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778, 782 (Bankr.D.Del.2004). Or, if the Debtor did badly, the Minority could be treated as equity and get its pro rata share of any remaining proceeds at the end of the liquidation process. The timing of the filing of the bankruptcy petition was also solely in the hands of the Majority, which controlled the Debtor. As noted above, it is ironic that the Majority decided to have the Debtor file shortly before the deadline for payment would expire. Had it waited a few hours without the Debtor paying the Judgment, the Minority would have returned to an undiluted equity status, be-

cause it would simply be entitled to its share of the proceeds of the Debtor's liquidation.[21] As a result, treating the Minority as a creditor does not confer an unfair advantage on it or an unfair disadvantage on the Majority (who both orchestrated the timing of the bankruptcy petition and controlled the treatment of the Minority's investment). Thus there is no requirement to remedy an inequity under § 510(b) by subordination.

Accordingly, the Court believes that the policy rationales of § 510(b) do not support subordination of Minority's claim "to the same priority as common stock." 11 U.S.C. § 510(b) and declines to do so.

### Conclusion

The Minority holds a claim subordinated to other unsecured claims and must be placed in its own class as it is not "substantially similar" to other claims or interests. This conclusion is inconsistent with the Debtor's confirmed plan of reorganization.

Section 7.6 of the Debtor's fourth amended plan of reorganization placed the Minority in Class 7 (common stock), and provided that holders of common stock could retain their stock or elect (within 30 days of the effective date) to voluntarily cancel their shares in exchange for a pro rata share of the liquidation value of the Debtor as of the confirmation date. Plan, ¶ 7.6. As the Minority holds a claim and cannot be classified with common stock, ¶ 7.6 cannot be applicable to them.

■ In the alternative, ¶ 7.4 of the plan (as amended by ¶ 4.a of the confirmation order) provided that:

> In addition, Class 5B includes, as a contingency, the alleged claim of the

Minority shareholders for approximately $5 million. In the event the Appellate Court enters a final order prior to the Date the Plan is substantially consummated reversing the Bankruptcy Court's ruling and finding that the Minority holds an allowed claim subordinated to the unsecured creditors but with priority over the equity, and if the Debtor cannot pay, or negotiate payment of the then allowed amount of that claim, then the Debtor shall immediately commence liquidation of the assets and distribute proceeds in accordance with the priority scheme set forth in the Code.

The contingency set forth in ¶ 7.4 has not occurred, because no order on the Minority's status has become final. While the District Court did reverse this Court's ruling and found the Minority held an allowed claim, it remanded for further proceedings in this Court. The District Court Order was appealed and the Ninth Circuit dismissed the appeal on the grounds that the District Court Order was not a "final appealable order."[22] So, while, I am sure that the Minority would not object if the Debtor deemed that the contingency of ¶ 7.4 had been met in spirit and so elected to liquidate, I will not require the Debtor to do so.

Since the plan does not offer the Minority treatment consistent with its priority, the court and the parties should consider appropriate next steps at the November 20, 2012 status conference.

### Exhibit A

### Court's Initial Analysis

Section 510(b) of the Bankruptcy Code provides:

---

**21.** The Minority might still have a Judgment for attorneys' fees in the amount of **AMOUNT**, but this would be separated from its equity status and treated as a subordinated unsecured claim.

**22.** Memorandum, entered 4/23/12, in *Orange County Nursery, Inc. v. The Minority Voting Trust, et al.,* 472 Fed.Appx. 727 (9th Cir.2012) (doc. 45–1).

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 [11 USCS § 502] on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

The question is whether the Dissolution Order and the District Court Order have created a forced purchase, thus calling § 510(b) into action.

*Ninth Circuit and Other Courts of Appeals Decisions*

Decisions in the Ninth Circuit interpreting § 510(b) start with *Am. Broad. Sys. v. Nugent (In re Betacom)*, 240 F.3d 823 (9th Cir.2001). While the facts of *Betacom* are not directly analogous to the present case (claim for damages under merger agreement pursuant to which target/debtor shareholders should have received stock of acquirer/debtor but did not; claim against acquirer in jointly administered cases), *Betacom* has been widely cited for the Ninth Circuit's expansive reading of § 510(b). In deciding to subordinate the claim under § 510(b), the court stated that § 510(b) was not limited to cases of shareholder fraud, that the subordinated claimant need not actually be a shareholder and that an actual sale of a security is not required. *Betacom*, 240 F.3d at 828–31. The court's decision rested on the policy behind § 510(b):

Section 510(b)'s legislative history does not reveal an intent to tie mandatory subordination exclusively to securities fraud claims. Congress relied heavily on the analysis of two law professors in crafting the statute. See H. Rep. 95–595, at 195 (1977), 1978 U.S.C.C.A.N. 5963, 6156 (explaining that the argument for mandatory subordination is best described by Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy—Allocating Risk of Illegal Securities Issuance Between Security holders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973)).... According to Slain and Kripke, the dissimilar expectations of investors and creditors should be taken into account in setting a standard for mandatory subordination. Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt. It is unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders.

. . . .

In determining whether or not an actual sale or purchase is required for mandatory subordination, we must examine the reasoning behind § 510(b). There are two main rationales for mandatory subordination: 1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.

The first rationale applies even if there is no "actual" sale or purchase. Before they receive any stock or extend a line of credit, investors and creditors have different expectations. Even if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor. The creditor can only recoup her investment; the investor expects to participate in firm profits. The

House Report on § 510 follows this logic:

> Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

H. Rep. 95–595 at 195; U.S. Code. Cong. & Admin. News 1978, at 6156.

The second rationale for not allowing shareholder claimants to take priority over creditor claimants is that creditors may rely on the funds contributed by the shareholders in assessing the risk of their loan to the debtor. The legislative history of § 510 specifically notes this argument in the Slain and Kripke article. . . .

*Betacom*, 240 F.3d at 829–830.

The Ninth Circuit decided a subsequent case under § 510(b), *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067 (9th Cir.2007), in which it restated its expansive reading of § 510(b), but declined to subordinate a claim under § 510(b). The claimant was not a shareholder and had not contracted to be a shareholder; he had merely contracted to be paid for his services on the basis of share price.

Several other Courts of Appeals have also adopted expansive readings of § 510(b), in each case concluding that the language of § 510(b) ("arising from the purchase or sale") is ambiguous and turning to legislative history and policy considerations, just as the Ninth Circuit did in *Betacom*. In *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173 (10th Cir.2002), the Tenth Circuit subordinated a shareholder's "fraudulent retention" claim (that debtor's fraud caused the shareholder to retain shares). The court concluded that § 510(b) bars claims arising from the purchase or sale of a security and "is not limited to issuance related claims." *Id.* at 1182. In *Baroda Hill Inv., Inc. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133 (3d Cir.2002), the Third Circuit subordinated shareholder's breach of contract claims based on the debtors' failure to use their best efforts to ensure stock was registered and freely tradable. The court declined to distinguish claims based on actionable conduct occurring after purchase of the security from claims based on actionable conduct occurring at the time of the purchase. In *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir.2006), the Second Circuit subordinated a breach of contract claim by a former employee for debtor's failure to issue its shares: "we interpret section 510(b) broadly to require subordination of the claim at issue." *Id.* at 259.

The Fifth Circuit's decision in *SeaQuest Diving, LP v. S & J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411 (5th Cir.2009) is the most factually similar Court of Appeals decision to the Orange County Nursery case, because it subordinated a claim based on a state court judgment enforcing a contract for the debtor to repurchase partnership interests in itself. However, the SeaQuest Diving contract "rescinded" the claimants' purchase of partnership interests. The Fifth Circuit distinguished this rescission-based claim, which was subject to § 510(b) subordination, from a claim based on redemption of ownership interests, which *might* not be. (The *SeaQuest* opinion examined several decisions refusing to subordinate promissory notes issued by debtors to repurchase

their own stock, *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836, 844–45 (Bankr.D.Del.2001), abrogated on other grounds by *Telegroup*, 281 F.3d at 142; *Official Comm. of Unsecured Creditors v. Am. Capital Fin. Servs. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778, 782 (Bankr. D.Del.2004), which are discussed in detail below. But the Fifth Circuit in *SeaQuest* ultimately declined to speak to whether they were correctly decided. *SeaQuest*, 579 F.3d at 423.) The Fifth Circuit focused on the underlying nature of a claim:

> We reject S & J's argument that "the equitable nature of a claim is lost once it is converted to a ... judgment." If the court could not look behind the judgment, then subordination of a rescission or tort claim based on securities fraud (which clearly falls within the purview of § 510(b)) would depend upon whether the claimant obtained a pre-petition judgment on the claim. We doubt that Congress intended such a result, which is contrary to the text and legislative history of the statute.

*Id.* at 425.

While these Circuit decisions are not on all fours with the instant case, they share an expansive reading of § 510(b) and set the ground rules for interpreting the statute. The Fifth Circuit's summary is particularly instructive:

> For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract. See *Telegroup*, 281 F.3d at 140, 142. They also agree that the term "arising from" is ambiguous, so resort to the legislative history is necessary. See *id.* at 138; *Geneva Steel*, 281 F.3d at 1178; *Med Diversified*, 461 F.3d at 255.

> For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. See *Telegroup*, 281 F.3d at 138. Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale. See *id.* at 142; *Geneva Steel*, 281 F.3d at 1179. "When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." [*In re Granite Partners, L.P.*, 208 B.R. 332, 344 (Bankr.S.D.N.Y.1997) ]. When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the "upside potential of shareholder status." *Med Diversified*, 461 F.3d at 256.

*SeaQuest*, 579 F.3d at 421–422.

Under this expansive interpretation and these ground rules, the Minority's claim should be subordinated. There is the required causal relationship between the claim and the purchase/sale of stock: the claim is payment from the sale of the Minority's share of the equity. The "underlying nature" of the claim is the recovery of the Minority's equity investment and the disregard of the absolute priority rule, triggering "the most important policy consideration" behind § 510(b): equity should not be able to recover its investment *pari passu* with creditors and disregard the absolute priority rule.

*Another Stock Repurchase Case*

*Weissmann v. Pre–Press Graphics Co. (In re Pre–Press Graphics Co.)*, 307 B.R. 65 (N.D.Ill.2004), is a District Court decision on similar facts. The court subordinated a shareholder's claim under a court order requiring debtor to repurchase 500

of its shares at a court determined "fair value" of $1,383,500 (as a remedy for breach of fiduciary duty and shareholder oppression). Like the courts of appeals, the *Pre–Press Graphics* court concluded that the statute was ambiguous, looked at policy considerations, adopted a broad reading of the statute and required a "causal link" between the claim and the purchase or sale of the stock, but that causal link need not arise contemporaneously with the purchase or sale. The court concluded that the claim arose from the debtor's oppressive conduct that was remedied with the judgment, which was causally linked to the purchase or sale of debtor's stock. "In proposing what later became § 510(b), [Slain and Kripke] sought to prevent a disaffected shareholder from recouping his or her investment ahead of unsecured creditors. In the court's view, that is exactly what [the claimant] is trying to do here." *Pre–Press Graphics*, 307 B.R. at 79.

Like the claimant in *Pre–Press Graphics*, the Minority are disaffected shareholders seeking to recoup their investment at the expense of unsecured creditors. Section 510(b) was created to subordinate just such disaffected shareholders seeking to end run the absolute priority rule and recoup their investment in the debtor ahead of other shareholders and *pari passu* with creditors.

*Promissory Note Cases*

One line of cases, primarily from the District of Delaware, has held that claims arising out of a promissory note issued prior to the petition date in exchange for stock are not subject to § 510(b) subordination: *Wu v. Stephen H. Swift Trust (In re Swift Instruments, Inc.)*, 2012 WL 762833 (9th Cir. BAP Mar.8, 2012); *In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 844–45 (Bankr.D.Del.2001), abro-

gated on other grounds by *Telegroup*, 281 F.3d at 142; *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr.D.Del.2004). The U.S. District Court for Delaware has extended this reasoning to a pre-petition judgment ordering the debtor to repurchase its stock from a shareholder. *Burtch v. Gannon (In re Cybersight)*, 2004 WL 2713098 (D.Del.2004). The reasoning of these cases is that the note or the judgment extinguished the claimant's right to participate in profits. Once the shareholder became a creditor, the rationales behind § 510(b)—dissimilar risk and return expectations of shareholders and creditors and the reliance of creditors on an equity cushion—no longer applied to justify subordination.

These promissory note cases seem premised on the issuance of a tangible debt instrument. *Mobile Tool* court distinguished *In re Alta + Cast, LLC*, 301 B.R. 150 (Bankr.D.Del.2003), where the claim against debtor for failure to purchase its stock from former employee was subordinated under § 510(b) because no debt instrument had ever issued. *Mobile Tool*, 306 B.R. at 782.

In the Ninth Circuit B.A.P. decision in *Swift*, the debt instruments were several promissory notes that had been issued by debtor between 1997 and 2003 under a 1952 agreement requiring the debtor to repurchase its shares upon the death of certain shareholders. The B.A.P. upheld the bankruptcy court's decision not to subordinate these notes in a bankruptcy case commenced in 2006. In doing so, the court characterized the Ninth Circuit decision in *Betacom* as holding that a promissory note claim may be subordinated under § 510(b) but not specifying what circumstances justify subordination. The B.A.P. then determined that the noteholders at issue in *Swift* held only the risk and return expectations of creditors and that no creditors

had relied on the equity that had been replaced by the notes in deciding whether to grant credit to the debtor.

This Court declines to apply the reasoning of these decisions to this case, primarily because the Minority shareholder's "claims" are quite different from the promissory notes and the judgment in these decisions. In each of these decisions, the claimant had received a tangible debt instrument (or judgment, in *Cybersight*) effectuating an exchange of equity for a sum certain obligation. Each claimant released its equity in exchange for debt: they had irrevocably traded the risks and rewards of equity for the risks and rewards of debt. (This is particularly essential to the *Swift* case, where the exchanges had occurred as many as nineteen and no fewer than three years prior to bankruptcy.)

The judgment in this case does not purely trade equity for debt. It provides that the Minority will receive *either* the payment specified in the judgment *or* their share of the proceeds of dissolution. If the debtor does not make the payment specified in the judgment, the Minority will be equity holders. As such, the amount that it recovers may be more or less than the judgment, which reflects its continuing role as an investor rather than as a creditor. So while the judgment may have given rise to a "claim," these claimants continue to have some expectation of sharing in the risks and rewards of the debtor as equity. Furthermore, creditors undoubtedly relied on the Minority's participation in the Debtor as 40.25% equity, rather than as the holder of a multi-million dollar claim. The rationales behind § 510(b) continue to apply in this case and justify subordination.

Even if the facts of this case were to fit the Delaware theory, these decisions are inconsistent with the broad interpretation of § 510(b) by the Ninth Circuit in *Betacom* and with that of the other courts of appeals that have considered § 510(b). These courts look at the underlying nature of the claim and have required only a causal connection between the claim and the purchase of stock. The fact that a claimant may have obtained a pre-petition note or a judgment on account of that equity interest does not change the reality that the claim arose out of the sale of an equity security and does not negate the fundamental unfairness of allowing some shareholders to elevate themselves at the expense of creditors and other shareholders. (As the Fifth Circuit noted, if a pre-petition judgment renders § 510(b) inapplicable, then securities fraud claims could be exempted from § 510(b) subordination simply by obtaining a pre-petition judgment, which is "contrary to the text and legislative history of the statute." *Sea-Quest*, 579 F.3d at 425.)